**Harry D. JAGOLINZER t/a G. H. Spencer Roofing Co., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 1796.

United States District Court
D. Rhode Island.

April 12, 1957.

Joseph J. Lyman, Washington, D. C., William I. Matzner, Providence, R. I., for plaintiff.

Joseph Mainelli, U. S. Atty., Samual S. Tanzi, Asst. U. S. Atty., Providence, R. I., for defendant.

DAY, District Judge.

In this action the plaintiff seeks to recover certain taxes paid by him under the provisions of the Federal Insurance Contributions Act, Title 26 U.S.C.A. § 1400 et seq. for the period from June 30, 1949 to December 31, 1951. These taxes were computed and paid upon the earnings of certain workers who are called "applicators". Plaintiff claims that such taxes were erroneously paid by him upon his mistaken understanding that such applicators were his employees within the meaning of Title 26 U.S.C.A. § 1426(d).

Application for a refund of said taxes was timely made, and was denied. This action was then instituted.

At the outset of the trial the parties stipulated that the plaintiff was waiving any claim to a refund of taxes which had been computed and paid upon the earnings of three individuals, named in his application for refund, who were not applicators and the recovery of which had been sought in said application.

Likewise the plaintiff waived any claim to the recovery of unemployment taxes paid by him on the wages of said individuals and said applicators although he had originally sought recovery thereof in his complaint in this action.

The parties also stipulated that all of the applicators concerned herein performed their services in substantially

the same manner. The evidence produced during the trial raised no factual dispute of any importance.

The plaintiff is now and was during the period involved herein engaged in the business of furnishing and applying roofing and siding materials to the roofs and exterior walls of dwelling houses and other frame buildings. He or his salesmen obtained the contracts for the furnishing of the materials and their application from the owners of the structures. These contracts specified the type of materials to be furnished and applied, the area to be covered and the price for the entire job.

The issue to be determined by me is the status of the individuals who actually performed the labor required under these contracts. As hereinbefore indicated these individuals are called applicators.

When the plaintiff was ready to have the materials applied under a particular contract he would make out a job card for the particular building to be repaired. This card would set forth the site of the job, an estimate of the amount of materials required and their description, a rough diagram of the area and part of the building where they were to be applied and a general description of the work to be performed. The unit used in computing the amount of materials was known as a "square" which consists of 100 square feet. All materials were transported to the particular job site by the plaintiff.

All of the applicators who performed labor for the plaintiff were experienced, skilled men. Some of them had worked from time to time for the previous owner of the plaintiff's business. After its acquisition by the plaintiff they continued to come to his office looking for work. The others came to him as the result of his newspaper advertisements indicating his need for the services of applicators.

Each job was assigned by the plaintiff to two applicators. They were given a job card for each separate job and their compensation for their work was made on the basis of a fixed rate for each square of material applied. This rate was ordinarily fixed by the plaintiff although actually it was usually the prevailing rate paid to applicators for such services in this area. Occasionally it was was the subject of negotiation between the plaintiff and the applicators before the latter would accept the assignment and occasionally the total compensation for a job was not divided equally between the two applicators performing the work. This unequal division, however, was a matter of agreement between the two applicators and the plaintiff made such a division only upon their joint direction. Applicators had the right to employ helpers but only at their own expense.

If a particular job involved gables or "cut-up" work or exceedingly small areas the applicators might decline to do the work on the square rate basis contending it would be unprofitable for them to do so. In such situations the plaintiff was required to negotiate with them as to the basis of compensation and to pay them an hourly rate satisfactory to them.

In addition to the materials, the plaintiff furnished all the staging and ladders required for each job. The applicators furnished their own tools such as a hammer, saw, level, etc. When not working on a job they would usually report at plaintiff's office at eight o'clock A.M. to see if any jobs were ready to be done. However, when engaged on a job there was no requirement that they report at plaintiff's office. They determined the hours during which they would work. No time clock was punched by them; and they did not account for their time to the plaintiff.

The applicators were not directed as to the length of time they should spend on a particular job. That was for them to determine. While the plaintiff usually visited the job site at least once as the work was being done, he did not undertake to give any instructions as to the means or methods to be used in applying the materials. No supervisors were employed by him. His only purpose in visiting the job site was to see that the

results being accomplished conformed to his contract with the owner of the structure.

When a particular job was completed before the end of a normal work day, if another job had not been assigned them previously, one of the applicators would ordinarily call plaintiff's office and inquire if any other job was ready to be performed. If the answer was in the affirmative, they would report to the office to secure the job card. Otherwise they would be free until further work was available. There was no agreement by the plaintiff to provide additional work and no obligation on the part of the applicators to seek or accept additional jobs. If they desired to take time off between jobs they were free to do so and no sanctions were invoked against them. There was nothing in the arrangement between them and the plaintiff which would hinder or preclude them from working on their own account or for other companies engaged in similar work between periods during which they worked for the plaintiff. If applicators failed to do their work in a satisfactory manner resulting in a justifiable complaint by the owner they were expected to repair any faulty work without additional compensation. They provided their own means of transportation to and from their homes to the job sites and plaintiff's office.

Payment for their services was usually made to the applicators on Friday of each week. Their compensation was calculated on the basis of the number of squares applied by them during the previous calendar week. If, before the completion of a job, an applicator was in need of money, the plaintiff would usually advance to him an amount measured by the number of squares which has been applied by him at the time of such advancement.

The applicators were not members of any union and were not given compensation for any days on which they did not work and were not given any paid vacations or so-called fringe benefits.

Under Title 26 U.S.C.A. § 1426(d) in its original form and as amended on August 28, 1950, the term employee is defined to mean any individual who, under the usual common-law rules applicable in determining the employee-employer relationship, has the status of an employee and not that of an independent contractor.

Under the foregoing definition the usual common law rules are to be applied in determining whether an individual is an employee of another. And in making this determination it is the total situation that controls. Bartels v. Birmingham, 332 U.S. 126, 130, 67 S.Ct. 1547, 91 L.Ed. 1947. But the fundamental test, while giving due consideration to all the other factors in a particular situation, seems to be whether there exists a right to control the activities of the individual whose status is in issue, not only as to the results to be accomplished by the work but also as to the means and methods to be used for accomplishing the result. Radio City Music Hall Corp. v. United States, 2 Cir., 135 F.2d 715; Party Cab Co. v. United States, 7 Cir., 172 F.2d 87, 10 A.L.R. 2d 358; National Labor Relations Board v. Nu-Car Carriers, 3 Cir., 189 F.2d 756. The importance of this test is recognized in the applicable Treasury Regulations, 26 C.F.R. § 402.204 and, for the period after January 1, 1951, 26 C.F.R. § 408.204, both of which contain in part the following:

"Who are employees.

* * * Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which the result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * * In general if an individual is subject to the

control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor."

In the instant case the plaintiff had no right to control and direct the applicators as to the means or methods used by them in accomplishing the result. There is nothing in the evidence to indicate that he ever attempted to exercise any such control or direction. His only concern was that the work being done by the applicators would accomplish a result in conformity with the terms of his contract with the owner of the structure to which the roofing or siding was being applied. The applicators decided when and during what hours they would work and the manner in which they would perform their work. The plaintiff had no more control over the applicators in these respects than a house owner could exercise over the independent contractor who was painting his house. While it is true that he could terminate an applicator's work before the completion of a particular job if the desired result was not being accomplished, this power was no different from that of a general contractor to declare a breach of his contract had been committed by a sub-contractor. Here the plaintiff could not direct an applicator to work on a particular job unless the latter was willing to do so. In the event the applicator considered that a particular job would be unprofitable to him at the customary rate per unit or square, his compensation therefor became a matter of negotiation between him and the plaintiff.

Considering all of the evidence, it is my opinion that the plaintiff and the applicators understood their relationship to be one in which the plaintiff had only the right to control the applicators as to the results to be accomplished, but not the right to control or direct them as to the means and methods for accomplishing the results. The applicators were independent contractors and not employees within the meaning of Title 26 U.S.C.A.

§ 1426(d). Metropolitan Roofing & Modern. Co. v. United States, D.C.Mass., 125 F.Supp. 670; Silver v. United States, D.C.N.D.N.Y., 131 F.Supp. 209; Millard's Incorporated v. United States, D.C. N.J., 146 F.Supp. 385. The cases cited by the defendant are in my opinion clearly distinguishable on their facts from the instant case.

The plaintiff is entitled to recover the taxes erroneously paid by him, the amount thereof to be computed by the parties. Judgment shall be entered in favor of the plaintiff in said amount when so computed.