**Billy G. POWERS, t/a Powers Roofing Company**

v.

**The UNITED STATES.**

No. 38–67.

United States Court of Claims.

April 17, 1970.

Joseph J. Lyman, Washington, D. C., attorney of record, for plaintiff.

Mark Segal, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on October 1, 1969. Defendant filed, then subsequently was allowed to withdraw, a notice of intention to except to the commissioner's report. On March 11, 1970, plaintiff filed a motion requesting that the court adopt the commissioner's opinion, findings and recommended conclusion of law. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby grants plaintiff's motion and adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c) (2).

### OPINION OF COMMISSIONER

BENNETT, Chief Commissioner:

This is a suit to recover Federal Unemployment Tax Act (FUTA) taxes of $1,579.90, together with statutory interest thereon, paid by plaintiff taxpayer for the year 1965. It is stipulated that the single issue presented is whether during the period involved, applicators performing services for plaintiff were "employees" of plaintiff within the meaning of the Federal Unemployment Tax Act, Internal Revenue Code of 1954, 26 U.S.C. § 3306(i), and pertinent regulations.

Plaintiff's business is that of repairing building exteriors needing roofing and siding. His commission salesmen obtain contracts for such work in Arkansas City, Kansas, and in a wide area out of that city. The workers who install roofing and siding are known in the trade as applicators. They are called by plaintiff or come to him on their own initiative in connection with work opportunities presented following storms and other circumstances. They are presented with a work order or worksheet describing the work to be done. They can take the work or leave it. If they don't like the job or the price they can reject it or negotiate with plaintiff.

In addition to the work order, plaintiff presented to applicators a document variously called Rules and Regulations for Sub-Contractors or Specifications for Sub-Contractors. The information there-

on was prepared by plaintiff and delineated the job relationship with plaintiff, the prime contractor. In summary, the applicators were required by these documents to do their work in a workmanlike manner and as quickly as possible, although it was left to them when they would start and what hours they would work. Plaintiff furnished the materials for the job but applicators furnished their own equipment (worth several hundred dollars) under the agreement; they were paid only after inspection showed the completed job to be satisfactory, and they forfeited the job if neglected or left so that it had to be finished by another.

In 1964 or 1965, applicators were expected to obtain a release from plaintiff before hiring out to one of plaintiff's competitors for "side work" done in a storm or catastrophe area. Applicators were free to work for other contractors before or after working for plaintiff and this did not prejudice them for future jobs with plaintiff. Plaintiff had no preferred call on an applicator's time except for the performance of an accepted work order nor did plaintiff guarantee applicators any work. Applicators paid their own expenses of travel, food and lodging, but they could draw advances on sums due them for work already partially completed. Applicators working for plaintiff performed in plaintiff's name on plaintiff's contracts.

A percentage was withheld from the sum due applicators to cover insurance, if they did not provide their own, and to cover the contingency of leaks in completed work. The unused portion of the percentage was refundable. Verbal instructions sometimes supplemented the work order and the rules and specifications. The percentage arrangement was verbal.

Applicators were paid on the basis of a specified price per 100 square feet of material applied. Different rates applied to different types of materials. Extra pay was given for extra work such as removing an old roof.

The applicators sometimes employed helpers who were paid out of the lump sum due the applicator from plaintiff. The pay of helpers was fixed by the applicator. However, by request of an applicator plaintiff would pay the helpers by check, deducting the amount from the sum due the applicator. Plaintiff did not withhold or pay any taxes for helpers. Helpers were supervised by the applicators who hired them. Plaintiff supervised the work of applicators, if at all, in only a cursory manner. He relied upon their skill and experience and the satisfaction of the property owner with their work. The larger jobs were sometimes inspected during their progress. On one occasion where plaintiff observed that an applicator had disappeared from the job and his helper was working for a competitor of plaintiff in violation of the aforesaid rules, plaintiff terminated the subcontract.

Applicators would occasionally contract independently with the property owners for comparatively minor repair work, such as carpentry, not contemplated in the prime contract between plaintiff and the owner. Plaintiff had no objection to this. However, if the applicator learned of a roofing or siding job he was expected to turn the information in to the plaintiff's office so that a salesman could attempt to get the contract. In turn, the applicator was normally offered the subcontract if the salesman was successful.

Plaintiff did not pay Unemployment Act taxes on these applicators, considering them to be independent subcontractors. He did so for the year 1965 only after being required to do so. This is plaintiff's second round with the Internal Revenue Service. On March 27, 1958, the United States District Court for the District of Kansas, in the unreported case of Billy G. Powers, t/a Powers Roofing & Siding Co. v. United States, Civil No. W–1365, determined that applicators performing services for plaintiff in his business were not employees for federal tax purposes. Defendant now contends that the facts in 1965 are stronger for the Government's position and that the applicators are em-

ployees within the terms of the law. A trial was held. Plaintiff and several applicators were heard, together with other witnesses. This case turns squarely on its facts and the weight of the credible evidence firmly establishes that the Government is wrong and that plaintiff is entitled to recover.

As previously noted, the sole issue for determination in this case is whether the applicators are "employees" as defined in applicable statutes and decisional law. The statutes define both what an employee is and what he is not. An employee is "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee * * *." 26 U.S.C. § 3121(d) (2).

The term "employee" does not include

(1) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an independent contractor, or

(2) any individual (except an officer of a corporation) who is not an employee under such common law rules. [26 U.S.C. § 3306(i).]

Both sections direct attention outside of themselves into the broader scope of "employee" as defined under the common law. Guidance to relevant criteria is found in the applicable Treasury regulation, which provides in pertinent part:

(b) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge

is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee * * *.

(c) Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case.

(d) If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if such relationship exists, it is of no consequence that the employee is designated as a partner, coadventurer, agent, independent contractor or the like. [Treas.Reg. § 31.3306(i)-1(b)-(d) (1956).]

The latter statute and interpreting regulation represent congressional disapproval of the so-called "economic reality" test as a primary tool to determine the presence or absence of an employer-employee relationship. The test sprang from language used by the Supreme Court in United States v. Silk, 331 U.S. 704, 713, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and Bartels v. Birmingham, 332 U.S. 126, 130, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), which was employed to support the proposition that, in addition to common law criteria, the definition of "employee" should be tailored to best accomplish the purposes of social security legislation. Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 3, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962); see, Illinois Tri-Seal Products, Inc. v. United States,

353 F.2d 216, 224–229, 173 Ct.Cl. 499, 512–519 (1965), providing a concise account of the development of the concept and its legislative rejection. Legislative rejection of the guideline based on "economic reality" left viable the "test" of realistically applying common law criteria concerning employer-employee relationships to the particularized and unique factual situations of the individual cases. Illinois Tri-Seal Products, Inc. v. United States, *supra*, 353 F.2d at 228, 173 Ct.Cl. at 518; Enochs v. Williams Packing & Navigation Co., *supra*, 370 U.S. at 3, 82 S.Ct. 1125.

Common law factors are not established in a hierarchical order with any one having predominant importance. Rather, " * * * degrees of control, opportunities for profit and loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete." United States v. Silk, *supra*, 331 U.S. at 716, 67 S.Ct. at 1469. "It is the total situation that controls." Bartels v. Birmingham, *supra*, 332 U.S. at 130, 67 S.Ct. at 1550.

As would be expected within this framework of broad guidelines, the finder of fact must accept the primary responsibility for applying relevant criteria on the basis of the total factual situation. Hoosier Home Improvement Co. v. United States, 350 F.2d 640 (7th Cir. 1965); Ben v. United States, 241 F.2d 127, 128 (2d Cir. 1957), aff'g per curiam 139 F. Supp. 883 (N.D.N.Y.1956). While a combination of factors usually is determinative, a single factor—control exercised by an alleged "employer" over the individual whose "employee" status is in question—most often overrides other criteria for determining the presence or absence of an employer-employee relationship. This court has observed that "the generally accepted and fundamental test is whether there exists, on the part of the employer, control or a right to control the activities of the alleged employee not only as to the result to be accomplished, but also as to the manner and method of attaining the result." Edwards v. United States, 168 F.Supp. 955, 957, 144 Ct.Cl. 158, 162 (1958). Cf. Illinois Tri-Seal Products, Inc. v. United States, *supra*, 353 F.2d at 223, 173 Ct.Cl. at 510; Security Roofing & Constr. Co. v. United States, 163 F.Supp. 794 (D. Mass.1958); Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717 (2d Cir. 1943). Such control may be exhibited in a number of ways depending upon the specific factual circumstances of the particular case. Detailed written instructions as to the manner of performance on a particular job, of course, would be strong evidence of the presence of control. The defendant here places great weight on the document variously entitled Rules and Regulations for Sub-Contractors or Specifications for Sub-Contractors, considering it to be the single "most important [evidentiary] factor" present in the case. Such reliance is misplaced as the document in question did not provide specific instructions for particular applicator assignments, but, rather, defined in a manner more general than specific, the overall job relationship which would be agreed to by the plaintiff and an applicator.

The occasional presence of a representative of the plaintiff at the jobsite where an applicator is working, by itself is of no particular significance. "Some * * * supervision is inherent in any joint undertaking, and does not make the contributing contractors employees." Radio City Music Hall Corp. v. United States, *supra* at 718.

On the other hand, the absence of supervision may be unimportant if the skill level required by the task is so low that supervision is unnecessary. Security Roofing & Constr. Co. v. United States, *supra*, 163 F.Supp. at 796. The latter caveat does not apply to the case at hand as the plaintiff relied upon expertise of the applicators whose skills were beyond those of unskilled workers performing repetitive tasks which would require no supervision. In the case at hand, the occasional presence at the worksite of a representative of the plaintiff was not, in

practice or intent, to supervise and direct the applicators in the details of their performance. Rather, when a job was of more than 1 or 2 days' duration, a company representative might inspect the jobsite in an effort to see if the work was progressing according to the work order and if sufficient materials were on hand for the job. If any doubt should arise as to the applicators conforming to the work order and contract, the homeowner would be contacted to insure that he was satisfied. There does not exist credible evidence supporting the contention that the plaintiff retain the right to supervise and direct the details of the applicators' performance even though an occasion may not have arisen in which the plaintiff was required to exercise such supervisory power. In addition, when applicators performed jobs at some distance from Arkansas City, Kansas, there might be no supervision of any kind. In those locations, work orders would be given to an applicator by one of plaintiff's salesmen who obtained contracts from customers. Subsequent communication between the plaintiff and the applicators regarding materials, payment, and other matters incidental to the work, was by mail.

Plaintiff's reliance on Hoosier Home Improvement Co. v. United States, *supra,* is inapposite. In that case the court specifically refused to challenge jury findings since the evidence was such that reasonable men could differ as to the conclusion which should flow from the particular facts. In addition, the controlling facts differed significantly from those at hand: Some applicators worked exclusively for the plaintiff roofing company; payment for some jobs was on an hourly basis; and, the president of the company appealed to applicators on the basis of "company loyalty." As examples, these factors indicate an overall pattern of control far more pervasive than that encountered in the present case.

Of obvious importance to the determination of the presence or absence of an employer-employee relationship is the right of the "employer" to discharge the individual whose "employee" status is in question. The right need not be exercised, as its mere presence is sufficient to be an indicator of control. E. F. Williams Co. v. United States, 139 F.Supp. 875, 877–878 (N.D.N.Y.1956). Defendant places great weight upon the fact that the plaintiff terminated the performance of one applicator before the job on which the applicator was working was finished, expanding this one instance into an alleged overall right of discharge. On balance, the record does not support either the factual contention of the defendant nor the conclusions sought to be drawn from it. In brief, the situation developed as follows: After beginning the job, the applicator in question got drunk, suffered an injury, and failed to show up for work. The applicator's helper, who was both hired and supervised by the applicator, but who was known to the plaintiff, was observed working for one of plaintiff's competitors, thus neglecting the job under the plaintiff's contract. Quite reasonably, plaintiff considered the subcontract breached under paragraph 8 of the Rules and Regulations or Specifications for Sub-Contractors which read:

8. SUB-CONTRACTOR HEREBY AGREED, once he starts a job he should complete that job as quickly as possible. Should he, through neglect or goofing off, leave his job open and it becomes necessary for the Company to get another contractor in order to get the job completed, the original sub-contractor shall FORFEIT ALL RIGHTS OF PAYMENT for the job started.

As a consequence of the applicator's actions, the plaintiff terminated the services of the applicator and his helper. The applicator was paid for the work he had already completed but the job had to be finished by another. The plaintiff's actions toward this applicator were not those of an employer discharging an employee. Rather, they were a manifestation of the right of a general contractor to declare that his sub-contract had been

breached by the subcontractor. *Jagolinzer v. United States,* 150 F.Supp. 489, 492 (D.R.I.1957); *Silver v. United States,* 131 F.Supp. 209, 212 (N.D.N.Y. 1954).

The belief of the parties as to the nature of their relationship may provide insights to its true nature. This court has said that "[i]n close cases * * * the view of their own relationship which is taken *and acted upon* by the parties—particularly with respect to the payment of employment taxes—is very significant." *Illinois Tri-Seal Products, Inc. v. United States, supra,* 353 F.2d at 218, 173 Ct.Cl. at 502. [Emphasis supplied.] But, as the pertinent regulation heretofore cited suggests in paragraph (d), what the parties say as to their relationship is immaterial if, in fact, it is something else. Most of the applicators called as witnesses indicated that they did not consider themselves to be in business for themselves during those times that they performed jobs for the plaintiff. Their testimony, beclouded by an aroma of hostility toward the plaintiff, arising from the withholding of a percentage of the subcontract payments to cover insurance and work defects, is not consistent with their actions. The only applicator so questioned disclosed that he paid income and social security taxes as a self-employed individual. The plaintiff did not consider the applicators to be employees and the evidence reveals that some of them received form 1099 at the end of the year 1965 disclosing the total compensation paid to them by the plaintiff during that year. Neither did the plaintiff consider himself obligated to withhold any of the compensation of the applicators for taxes or to file returns and pay taxes for them until audited and required to do so by the Internal Revenue Service.

In the same vein, the defendant emphasizes that the applicators did not work for other roofing companies during the time that they were performing jobs for the plaintiff, implying plaintiff's control over, and preferred call upon, the time of the applicators. However, as the applicators performed the jobs alone, or in combination with no more than a few helpers, it is unlikely that they would have been able to deal adequately with more than one job at a time. And, despite their testimony, at least three applicators left jobs they were doing for the plaintiff before completion and without obtaining releases. This action did not in fact bar them from obtaining subsequent jobs from the plaintiff. They also freely rejected work orders when offered them by the plaintiff, worked on their own account, and contracted their services to competitors of the plaintiff when not doing jobs for him. The plaintiff, however, did reasonably insist that when an applicator accepted one of his jobs that it be finished before the applicator worked for someone else. In sum, the weight of the credible evidence suggests that the overall pattern of the applicators' actions indicated independence from the plaintiff and far overshadows the applicators' contrary and limited view of their employment status.

When taken as part of the total situation, several other factors underscore the applicators' independence: The applicators furnished and maintained their own tools and equipment, usually worth several hundred dollars, except on the rare occasion when the plaintiff would furnish a special piece of equipment or a truck. They provided their own transportation to and from the worksite and paid food and lodging costs. They were also charged with the responsibility of hauling away debris from the worksite. Payment was usually at the completion of a job and there was no set pay day, but the applicators could draw advances on partially completed work. Additional pay would be negotiated for extra work of a substantial nature. If the homeowner desired minor repair work not contemplated in the contract or work order, the applicator could contract with the homeowner in his own name for the performance of the work without contacting the plaintiff. With the single exception previously described, helpers were under the complete control of the

applicators as to hiring, supervision, discharge and rate of pay. Payment to the helpers would be from the total sum due the applicator, as determined by the applicator. The applicators determined their own work hours and no specific time was established for the completion of their jobs. When these circumstances are added to others previously noted, "the total situation" strongly suggests that the dealings of the plaintiff with the applicators should only be described as those of a principal contractor with his subcontractor. Jagolinzer v. United States, *supra*, 150 F.Supp. at 492.

As has been noted above, cases in this area turn on their particular factual patterns. Guidance provided by the specific facts of prior cases, therefore, is at best imperfect. It should be noted, however, that strong similarities exist between the facts at hand and several prior decisions of this court. Rayhill v. United States, 364 F.2d 347, 176 Ct.Cl. 1120 (1966); Illinios Tri-Seal Products, Inc. v. United States, *supra*; Edwards v. United States, *supra*. In each, the applicators or installers were free to set their own hours; brought their own tools, supplies, and equipment to the worksite; supplied their own transportation and related expenses; were free from plaintiff's control as to the use and hiring of assistants; could perform jobs in their own names and were free to contract for minor work with the homeowner at the jobsite; were paid on a per job basis with no pay day being set; and, were responsible for cleanup following job performance. While again raising the caveat of the necessity to base decisions only on the totality of specific facts present in a case rather than relying on analogy from prior specialized factual situations, the defendant's heavy reliance on Security Roofing & Constr. Co. v. United States, *supra*, and Ben v. United States, 139 F.Supp. 883 (N.D.N.Y.1956), aff'd per curiam, 241 F.2d 127 (2d Cir. 1957), is misplaced.

Some factual differences in *Security Roofing* which illustrate an overall pattern of control by the roofing company over its applicators include: The roofing company usually supplied the staging and ladders as well as the materials; the jobs were usually calculated on the same rate basis without negotiation, regardless of a job's difficulty; the applicator could be taken off one job and moved to another; applicator teams working on one project could be split up and one or more members moved to other jobsites; an applicator could be discharged at any time for cause; no extra work, including carpentry, which might be desired by the homeowner could be contracted for by the applicator with the homeowner in an independent capacity; and the workers were closely supervised and instructed by the company.

Similarly, in Ben v. United States, *supra*, several applicators appeared to depend exclusively on the plaintiff during the seasons when roofing work is most commonly done; while an applicator might refuse a worksheet from the roofing company, he would usually not be offered another if he did refuse one; if additional work was required to be performed, the applicator was not free to contract independently with the homeowner but had to first contact the roofing company which would make contractual arrangements with the homeowner in its own name; the right of discharge was asserted by the taxpayer; and Ben Corporation would consider it a breach of faith if the applicator, at any time, even when not performing assignments for the plaintiff, would undertake jobs which would place him in competition with the roofing firm whether such work was performed in the applicator's own name or for another roofing company; and, a broad right of discharge was exercised over the applicators.

While isolated from the cases in which they occur, these factors are representative of an overall pattern of control by and dependence upon the roofing company by the workmen whose employee status was in question. Such dependence differs from the spirit of independence found in those cases in which applicators have been held not to be employees

of roofing companies for which they performed services, See, Illinois Tri-Seal Products, Inc. v. United States, *supra,* 353 F.2d at 231–232, 173 Ct.Cl. at 523–525, discussion and cases cited therein. It also contrasts sharply with the overall factual pattern of the case at hand.

Thus, the weight of the credible evidence strongly favors the plaintiff's contention that he did not exercise common law control over the applicators and that they should not be classified as his employees for federal unemployment tax purposes. Plaintiff is, therefore, entitled to judgment for refund of federal unemployment taxes improperly required to be paid.

Plaintiff places great reliance upon the prior United States District Court holding that applicators who worked for him during 1956 were not "employees" for federal unemployment tax purposes. Billy G. Powers, t/a Powers Roofing & Siding Co. v. United States, Civil No. W–1365 (S.D.Kan., filed Mar. 27, 1958). Due to similarities in the hiring practices then and now, it is the plaintiff's contention, sharply disputed by the defendant, that the doctrine, of *stare decisis* should apply to the present case, eliminating the need for this court to reach a decision on the merits. Because of the conclusion, reached through an examination of the applicable law and facts described above, that the applicators who worked for the plaintiff in 1965 were not his employees, the issue need not be reached. However, due to the emphasis placed upon the question by the parties, mention of it is made here.

The related doctrines of collateral estoppel and *stare decisis* are applied to end constant litigation over the same facts and issues in later time periods. Generally, the use of collateral estoppel is limited to "situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." Commissioner of In-

ternal Revenue v. Sunnen, 333 U.S. 591, 599–600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948). *Stare decisis* is applied where the parties, the law, and the controlling facts remain the same, but the facts are separable in the two causes of action. If the first tribunal fully considered the evidence and identity of result would be "just and desirable," the same or a second court is free to apply the doctrine in the second suit. Ben Constr. Corp. v. United States, 312 F.2d 781, 782, 160 Ct.Cl. 604, 606 (1963); cf. Forrest Village Apts., Inc. v. United States, 371 F. 2d 500, 178 Ct.Cl. 490 (1967).

Noting at the outset that 9 years passed between the two taxable years in question, several differences appear in the two cases: In 1956, the plaintiff operated solely in Wichita and Arkansas City, Kansas. Nine years later his business had expanded beyond that state's boundaries. The worksheet or order provided to the applicators in 1956 contained the name and address of the customer where the work was to be performed and a general statement of the nature of the work to be done. In 1965 the work order might additionally state the general methods an applicator was to use in doing a job or whether there was to be a deviation from a material manufacturer's instructions. While no written agreement other than the work order would be executed between the plaintiff and the applicator in 1956, in 1965 he would be presented with, and might be asked to read or sign, an additional document entitled Rules and Regulations for Sub-Contractors or Specifications for Sub-Contractors. The 1958 findings indicate that the applicator, either through negotiation or on a per square basis, priced all carpentry work through the plaintiff. In contrast, during 1965, the applicator would contract on his own for carpentry or other extra work of a minor nature. While the 1958 findings imply that the sole means of payment to applicators' helpers was by check from the plaintiff, with the amount being subtracted from the total amount due the applicator, in 1965 the applicators could

pay the helpers themselves from the sum due from plaintiff under the subcontract. In 1956 the applicators received no instructions as to how or in what manner the work should be started, or the method to be used in applying the materials. In 1965, however, the plaintiff might give verbal instruction to the applicators in addition to those in the worksheet.

In sum, while the most general patterns of the relationship between the applicators and the plaintiff appear to be the same for the two tax periods in question, there are several specific differences in the way in which the plaintiff carried on his business in 1956 and 1965. Lacking identity of facts, the doctrine of collateral estoppel is inapplicable. Commissioner of Internal Revenue v. Sunnen, *supra*. The entire thrust of the trial evidence, as agreed to by the parties, was directed toward the facts as they existed in 1965. No attempt was made to present evidence of similar practices in 1956. Particularly in the tax field, where every tax period may present a new set of circumstances, a factual background in greater depth would have to be laid by the parties to permit more delicate distinctions to be drawn by the court. At least, the evidence does not permit analogies of such quality to be drawn that it can be said that similarity of result in the two cases is "just and desirable" purely as a matter of law. Ben Constr. Corp. v. United States, *supra*. As a consequence, reliance on the doctrine of *stare decisis* is not compelling. In any event, the question is mooted by the clear basis for rendering a decision on the merits, as decribed above.

Thus, it is concluded upon examination of the facts in this and in similar cases, and applying the law as laid down by the cases, the statute and pertinent regulation, the applicators, in the instant case, in 1965, were not employees of the plaintiff for federal unemployment tax purposes. Accordingly, judgment should be entered for plaintiff for the refund claimed with interest as allowed by law.