*Decisions will be entered under Rule 155.*

GORDON T. O'BRIEN AND DERELYSE O'BRIEN, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8541–81.     Filed November 9, 1982.

---

Kevin O. O'Brien, for the petitioners.
Donald T. Rocen and Byron Calderon, for the respondent.

DAWSON, Judge: Respondent determined a deficiency of $450 in petitioners' Federal income tax for 1977. The issues to be decided are: (1) Whether the amount expended by petitioners for accounting and data processing services performed by their son constitutes wages for purposes of the new jobs credit under section 44B;[1] and (2) whether for purposes of determining the investment tax credit under section 38, the basis of new section 38 property should be reduced by the amount of the new jobs credit allocable to wages paid for the construction of the property and capitalized as part of its cost.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference.

Petitioners Gordon T. O'Brien and Derelyse O'Brien (Derelyse) are husband and wife. At the time they filed their petition in this case, they resided in Delta, Colo. Petitioners filed a joint Federal income tax return for the calendar year 1977 with the Internal Revenue Service, Ogden, Utah.

In 1977, Terrence D. O'Brien (Terrence), petitioners' son, was a senior at the University of Denver majoring in accounting and computer science. During the summer of 1977, after his graduation from college, Terrence worked on petitioners' ranch repairing and constructing farm fences. He also worked for the University of Denver as a consultant in both its regular and business computer centers and for Price-Waterhouse as a staff consultant.

In 1977, petitioners engaged Terrence to perform accounting and data processing services. The services were related to the

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable year in issue, unless otherwise indicated.

operation of their ranch and consisted of attending to Derelyse's bookkeeping for that year and also developing computer programs to calculate depreciation schedules, accounts receivable, accounts payable, and general ledger items. Petitioners paid Terrence $1,500 for these accounting and computer services. The entire amount was paid when Terrence began rendering the services.

Terrence was not required to work any particular number of hours in performing the accounting and data processing services. He worked in his room in the fraternity dormitory where he lived and used the facilities of the special business computer lab at the University of Denver. He did not have an office at the time he performed the services and did not offer his accounting and data processing services to the public. Moreover, he had not performed these types of bookkeeping and computer services prior to 1977.

The financial information used in Terrence's services was either sent to him at the University of Denver by Derelyse or given to him when he went home on weekends. Terrence obtained from the university most of the bookkeeping forms and other materials that he used. He utilized the computer system at the university to do all the data processing work.

Derelyse informed Terrence of the accounts she needed and the types of computer programs she wanted. She had difficulty calculating depreciation, even though she had taken an accounting course. On one occasion, she required that Terrence rearrange some of the accounting work he had completed into a system more familiar to her. Her only knowledge of computers was derived from her accounting course. Consequently, she did not anticipate the length of time Terrence needed to develop the computer programs for her.

Petitioners incurred expenses for labor relating to construction of a new fence in 1977. Petitioners capitalized these expenses as part of the depreciable basis of the fence. On their 1977 income tax return, petitioners claimed a depreciation deduction and an investment credit for the cost of the new fence, listing its basis as $3,666. They also claimed as a farm expense deduction, $1,620 paid for professional service, which amount included the $1,500 paid to Terrence for accounting and data processing services. Petitioners subsequently filed an amended income tax return for 1977 and claimed a refund. On

their amended return, petitioners recalculated the cost of the new farm fence, lowering its basis to $3,050 and reducing the depreciation deduction and investment credit accordingly. Petitioners also claimed a new jobs credit under section 44B for the amount paid for professional services and for wages paid for labor relating to construction of the new fence and repair of existing fences. Because of the new jobs credit, petitioners reduced their deduction for wage expense and made a further reduction in the deduction for depreciation on the new fence. Petitioners did not, however, adjust the investment credit on the fence on account of the new jobs credit. They also did not change the deduction of $1,620 paid for professional service on their amended return. Petitioners now concede that they expended only $1,570 for professional services in 1977.

In his notice of deficiency, respondent disallowed the new jobs credit for the amount paid for professional services, including the $1,500 paid to Terrence for accounting and computer services. Respondent did not dispute the allowance of the new jobs credit for wages paid for labor on the farm fences. To reflect this change in the amount of new jobs credit, respondent adjusted the deductions for wage expense and depreciation on the new fence. Respondent also recomputed the investment credit, reducing the basis of the new farm fence by the amount of new jobs credit allocable to construction of the fence. However, in making adjustments to the basis of the new fence for depreciation and investment credit purposes, respondent used the basis reported on petitioners' original return rather than the corrected basis reported on the amended return.

## OPINION

### Issue 1. New Jobs Credit (Professional Services)

Section 44B provides that "There shall be allowed as a credit against the tax imposed by this chapter the amount determined under subpart D of this part." Under subpart D, the amount allowable is 50 percent of the excess of the aggregate unemployment insurance wages paid during 1977 over 102 percent of the aggregate unemployment insurance wages paid in 1976. Sec. 51(a)(1). Section 51(f)(1) provides that the term

"unemployment insurance wages" has the meaning given the term "wages" by section 3306(b).

Section 3306(b) defines "wages" as all remuneration for employment. According to section 3306(c), "employment" means any service performed by an employee for the person employing him. Whether the amount paid to Terrence for accounting and data processing services qualifies for the new jobs credit depends, therefore, on whether he performed these services for petitioners as their employee.

The existence of an employer-employee relationship depends on the particular facts of each case. Sec. 31.3306(i)–1(c), Employment Tax Regs. Petitioners bear the burden of proving that such a relationship exists in this case. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. On balance, we think petitioners have failed to carry their burden. The facts favor respondent's contention that Terrence was not petitioners' employee, but rather an independent contractor providing accounting and data processing services.

Under section 31.3306(i)–1(b), Employment Tax Regs.,[2] an

---

[2]Sec. 31.3306(i)–1, Employment Tax Regs., provides:

(a) Every individual is an employee if the relationship between him and the person for whom he performs services is the legal relationship of employer and employee. * * *

(b) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees.

(c) Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case.

(d) If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if such relationship exists, it is of no consequence that the employee is designated as a partner, coadventurer, agent, independent contractor, or the like.

employer-employee relationship generally exists when the person for whom services are performed has the right to control not only the result of the work, but also the means and details by which that result is accomplished. The record in this case indicates that petitioners did not actually control or supervise the manner in which Terrence performed the accounting and computer services. He worked in his own room or in the computer lab at the University of Denver, not at petitioners' place of business. He set his own hours. In general, Derelyse informed her son as to the result she desired, and Terrence accomplished the tasks on his own. Although Derelyse did instruct Terrence to change to a more familiar accounting system on one occasion, her instruction was directed at the result and not the details of the work.

While petitioners did not actually direct the manner in which Terrence performed his services, an employer-employee relationship may still have existed if they had the right to do so.[3] However, the record does not indicate that petitioners had such a right. Derelyse had difficulty determining depreciation and had a very limited understanding of computers. Terrence, on the other hand, was a graduating senior majoring in accounting and computer science. Petitioners paid him a predetermined amount for the services he was to perform. He then attended to the bookkeeping and data processing using the resources available to him and relying on his own skill and knowledge.

Although control is the most important factor in determining whether an employer-employee relationship exists (*United States v. W. M. Webb, Inc.*, 397 U.S. 179, 192 (1970)),[4] it is the total situation that is determinative. *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947); *United States v. Silk*, 331 U.S. 704, 716 (1947). Other factors that are to be taken into account

---

[3]In this connection, it is not necessary that an employer actually direct or control the manner in which services are performed, it is sufficient that the employer has the right to do so. Sec. 31.3306(i)-1(b), Employment Tax Regs.

[4]The Senate Finance Committee cited with approval regulations which emphasized the factor of control in determining the existence of an employer-employee relationship under the employment tax. S. Rept. 1255, 80th Cong., 2d Sess. 3 (1948). This report accompanied the so-called "Status-Quo" Resolution, H.J. Res. 296, 62 Stat. 438 (1948), amending the definition of employee and reaffirming Congress' intent that the common law test of control should apply.

include the permanency of the relationship, the investment in the facilities for work, and the skill required in rendering the service. *Wolfe v. United States*, 570 F.2d 278 (8th Cir. 1978); *Avis Rent A Car System, Inc. v. United States*, 503 F.2d 423 (2d Cir. 1974); *Powers v. United States*, 191 Ct. Cl. 762, 424 F.2d 593 (1970). See also sec. 31.3306(i)–1(b), Employment Tax Regs., listing the furnishing of tools and a place to work as an additional factor characteristic of employers.

Consideration of these additional factors also supports our view that Terrence was not petitioners' employee. Petitioners did not furnish Terrence with the necessary materials or a place to work. The arrangements regarding the accounting and computer services did not establish a long-term working relationship, and these services required a high degree of specialized skill.

Petitioners point to certain factors which indicate that Terrence was their employee and not an independent contractor. Terrence did not maintain an office of his own and did not offer his services to the public, as is characteristic of independent contractors. Sec. 31.3306(i)–1(b), Employment Tax Regs.[5] But these factors cannot be considered in isolation. The totality of circumstances must be considered. As previously stated, we think the working relationship maintained by Terrence while rendering accounting and data processing services to petitioners was that of an independent contractor. Accordingly, we hold that petitioners are not entitled to the new jobs credit under section 44B for the amount paid to Terrence for these services.[6]

## Issue 2. Investment Credit (Farm Fence)

Section 38 allows as a credit "the amount determined under subpart B of this part." Under subpart B, the credit includes

---

[5]Petitioners also correctly point out that the characterization of the accounting and computer services as "professional service" on petitioners' original return is immaterial. Sec. 31.3306(i)–1(d), Employment Tax Regs.

[6]Petitioners offered no evidence concerning the additional $70 allegedly paid for professional service in excess of the $1,500 paid to Terrence. Consequently, petitioners are not entitled to a new jobs credit for the additional $70. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

an amount equal to 10 percent of "qualified investment."[7] "Qualified investment" is defined by section 46(c)(1)(A) as the applicable percentage of the basis of each "new section 38 property."[8]

The new farm fence constructed by petitioners in 1977 qualifies as "new section 38 property."[9] The parties agree that depreciation is allowable on the fence and that for computational purposes, its useful life is 7 years. In determining "qualified investment," the applicable percentage for property with a useful life of 7 years or more is 100 percent. Sec. 46(c)(2). The issue presented in the instant case concerns the determi-

---

[7]SEC. 46. AMOUNT OF CREDIT.

(a) GENERAL RULE.

(1) FIRST-IN-FIRST-OUT RULE.—The amount of the credit allowed by section 38 for the taxable year shall be an amount equal to the sum of—

\* \* \* \* \* \* \*

(B) the amount of the credit determined under paragraph (2) for such taxable year,
\* \* \*

\* \* \* \* \* \* \*

(2) AMOUNT OF CREDIT FOR CURRENT TAXABLE YEAR.—

(A) 10 PERCENT CREDIT.—Except as otherwise provided in subparagraph (B), in the case of a property described in subparagraph (D), the amount of the credit determined under this paragraph for the taxable year shall be an amount equal to 10 percent of the qualified investment (as determined under subsections (c) and (d)).

\* \* \* \* \* \* \*

(D) TRANSITIONAL RULES.—The provisions of subparagraphs (A) and (B) shall apply only to—

(i) property to which subsection (d) does not apply, the construction, reconstruction, or erection of which is completed by the taxpayer after January 21, 1975, but only to the extent of the basis thereof attributable to the construction, reconstruction, or erection after January 21, 1975, and before January 1, 1981,

Sec. 46(d) does not apply to the farm fence constructed by petitioners, if only because petitioners did not make an election as provided in that section.

[8]"New section 38 property" includes "section 38 property" which is constructed by the taxpayer after 1961. Sec. 48(b)(1). Sec. 48(a) defines "section 38 property" as follows:

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

\* \* \* \* \* \* \*

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, \* \* \*

\* \* \* \* \* \* \*

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more.

[9]Sec. 1.48–1(d)(4), Income Tax Regs., includes "fences used to confine livestock" as an example of property used as an integral part of the specified activity.

nation of the basis of new section 38 property to be used in computing the investment credit.

In his notice of deficiency, respondent allowed an investment credit for only a portion of the cost of the new farm fence. Respondent contends that in computing the investment credit, the basis of new section 38 property should be reduced by the amount of new jobs credit taken with respect to capitalized wages included in the basis of such property. Petitioners contend that, for purposes of the investment credit, basis should not be diminished by the amount of new jobs credit.

Petitioners rely on the regulations promulgated under section 46, specifically section 1.46–3(c)(1), Income Tax Regs., which provides as follows:

The basis of any new section 38 property shall be determined with the general rules for determining the basis of property. Thus, the basis of property would generally be its cost (see section 1012), unreduced by the adjustment to basis provided by section 48(g)(1) with respect to property placed in service before January 1, 1964, and any other adjustment to basis, such as that for depreciation, and would include all items properly included by the taxpayer in the depreciable basis of the property, such as installation and freight costs. * * *

Wages paid in connection with construction of a capital asset must be capitalized and are properly included in the depreciable basis of the asset. *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 13 (1974).

Respondent argues that allowance of both a new jobs credit and an investment credit for the full cost of the fence provides petitioners with a double credit for the same expenditure. He contends that this result is contrary to the rule that double tax benefits are not allowed unless specifically authorized by Congress. We agree.

Although petitioners are correct in their argument that, under the literal language of the regulation, basis includes the full amount of wages paid, we think that, in the present situation, basis must be adjusted to eliminate the double credit. The Internal Revenue Code should not be interpreted to allow double deductions or their practical equivalent in the absence of a specific declaration of congressional intent. *United States v. Skelly Oil Co.*, 394 U.S. 678, 684 (1969); *Charles Ilfeld Co. v. Hernandez*, 292 U.S. 62, 68 (1934). This

rule applies in the case of double credits. *United Telecommunications, Inc. v. Commissioner*, 589 F.2d 1383, 1387–1388 (10th Cir. 1978), affg. 65 T.C. 278 (1975), Supplemental Opinion 67 T.C. 760 (1977), cert. denied 442 U.S. 917 (1979).

There is no specific statutory authorization allowing a new jobs credit and an investment credit for the same expenditure. Nothing in the legislative history of the new jobs credit indicates that Congress intended to allow such a double credit.[10] In view of the rule against double deductions, we think Congress did not intend to allow the full amount of both credits for the same expenditure.

This Court confronted an analogous situation in *United Telecommunications, Inc. v. Commissioner, supra*. The taxpayer in that case challenged regulations providing that the basis of new section 38 property shall not include depreciation on other property used to construct the new section 38 property.[11] Like wages paid in connection with the construction of property, depreciation on construction equipment must be capitalized and recovered as part of the cost of the property constructed with such equipment. *Commissioner v. Idaho Power Co., supra*. The taxpayer, using its own equipment to construct new section 38 property, capitalized the depreciation on the equipment as part of the basis of the constructed property and used that basis in computing the investment credit. However, the taxpayer also claimed an investment credit for the cost of the construction equipment when it qualified, thereby taking two credits for the same expenditure.

---

[10]Congress first enacted the investment credit in sec. 2, Revenue Act of 1962, Pub. L. 87–834, 76 Stat. 970.

The new jobs credit was enacted by sec. 202(a), Tax Reduction and Simplification Act of 1977, Pub. L. 95–30, 91 Stat. 141. The Senate Finance Committee proposed allowing businesses to elect either a new jobs credit or an additional 2-percent investment credit. This proposal was meant to provide incentive to both capital-intensive and labor-intensive businesses. S. Rept. 95–66 (1977), 1977–1 C.B. 469, 486. The Senate amendment was rejected in conference. Conf. Rept. 95–263 (1977), 1977–1 C.B. 519, 521. None of the reports accompanying the new jobs credit legislation indicate that Congress contemplated expenditures for new hiring would also qualify for an investment credit.

[11]After stating the rule that basis generally equals cost, sec. 1.46–3(c)(1), Income Tax Regs., states:

"However, for purposes of determining qualified investment, the basis of new section 38 property constructed, reconstructed, or erected by the taxpayer shall not include any depreciation sustained with respect to any other property used in the construction, reconstruction, or erection of such new section 38 property. (See par. (b)(4) of sec. 1.48–1.) * * * "

The Tax Court upheld the validity of the regulation to the extent that it denied the double credit. However, insofar as it prohibited the depreciation on construction equipment that did not qualify for the investment credit from being included in the basis of the constructed property, the regulation was held invalid. Five concurring judges would have upheld the regulation in full by narrowly construing it as applying only to situations in which a double credit was available.[12]

The Tenth Circuit affirmed the Tax Court, but adopted the view of the concurring judges. The Court of Appeals held the regulation fully valid even though the statutory language contained no specific prohibition against the double credits claimed by the taxpayer. It applied the rule that when the statute is silent, it is presumed that double deductions are not allowed. In support of its conclusion, the court pointed to other instances in which Congress acted to prevent multiple credits. 589 F.2d at 1389.

We think the same reasoning is applicable in the instant case. Petitioners capitalized their wage expense as part of the basis of the fence and used that basis in computing the investment credit. Petitioners also claimed a new jobs credit for the wage expense. Thus, like the taxpayer in *United Telecommunications*, they claimed for one expenditure a double credit that is not authorized by statute.

---

[12]The concurring judges read the regulation in pari materia with sec. 1.48–1(b)(4), Income Tax Regs., to which sec. 1.46–3(c)(1), Income Tax Regs., refers. Sec. 1.48–1(b)(4), Income Tax Regs., provides:

(4) If depreciation sustained on property is not an allowable deduction for the taxable year but is added to the basis of property being constructed, reconstructed, or erected by the taxpayer, for purposes of subparagraph (1) of this paragraph a deduction for depreciation shall be treated as allowable for the taxable year with respect to the property on which depreciation is sustained. Thus, if $1,000 of depreciation sustained with respect to property no. 1, which is placed in service in 1964 by taxpayer A, is not allowable to A as a deduction for 1964 but is added to the basis of property being constructed by A (property no. 2), for purposes of subparagraph (1) of this paragraph a deduction for depreciation shall be treated as allowable to A for 1964 with respect to property no. 1. However, the $1,000 amount is not included in the basis of property no. 2 for purposes of determining A's qualified investment with respect to property no. 2. See paragraph (c)(1) of sec. 1.46–3.

The effect of this regulation is to prevent construction equipment, the depreciation on which is capitalized, from being disqualified from the investment credit because depreciation was not deducted. Thus, when both the construction equipment and the constructed property qualify for the investment credit, sec. 1.48–1(b)(4), Income Tax Regs., allows the taxpayer to take an investment credit on the construction equipment, while sec. 1.46–3(c)(1), Income Tax Regs., prevents the taxpayer from taking a double credit by including the depreciation in the basis of the constructed property.

Petitioners contend that both the new jobs credit and investment credit should be allowed for the same expenditure because they are based on separate sections which were enacted to further distinct congressional policies. The Supreme Court has held, however, that double deductions or their practical equivalent are not allowed even when based on separate and distinct sections of the Code. In *United States v. Skelly Oil Co., supra,* the taxpayer included its sales receipts in gross income for certain years. The sales receipts were also included in "gross income from the property" as defined in section 613, allowing the taxpayer to deduct a percentage of the receipts to compensate for depletion of natural resources.[13] In subsequent years, the taxpayer refunded a portion of the receipts to its customers because of overcharges, and claimed a deduction for the full amount refunded under the "claim-of-right" doctrine recognized by Congress in section 1341.

Section 613 provided a deduction to recoup the taxpayer's investment in depleted mineral resources. The refunds of previously reported income, on the other hand, were deductible because they constituted either a business expense under section 162 or a loss under section 165. Nevertheless, the Supreme Court ruled that deduction of the refunded amount resulted in an improper double deduction because the depletion allowance was computed as a percentage of the income that was later refunded. The deduction claimed by the taxpayer was reduced, therefore, by the percentage previously claimed as a depletion allowance.

Thus, the fact that the two credits claimed by petitioners are based on separate statutory provisions does not prevent their claim from being characterized as an impermissible double tax benefit. Petitioners are therefore incorrect in arguing that two independent provisions allowing different credits constitute a specific statutory authorization permitting a double credit. If Congress wanted to allow a double credit in this situation, it could have easily provided that the full amounts should be allowed when the same expenditure qualifies for both the new jobs credit and the investment credit. See, e.g., sec. 46(g)(3).

---

[13]The taxpayer received the income during the years 1952 through 1957. At that time, sec. 613 allowed a deduction for percentage depletion.

Congress has acted to prevent abuses arising from the combination of the new jobs credit and another tax benefit provision. Section 280C reduces the allowable deduction for wages by the amount of new jobs credit allowed. Section 1.280C–1, Income Tax Regs., provides for a corresponding reduction in the amount subject to depreciation when wages are capitalized. This section is designed to prevent the combination of the new jobs credit and the wage deduction from making it profitable for an employer to pay an employee not to work.[14]

It could be argued that because Congress has made no such express provision regarding the double credit claimed in the instant case, both the new jobs credit and investment credit should be allowed in full. As stated above, however, when the statute is silent, the presumption is opposed to such a double credit. Furthermore, *United Telecommunications* teaches that in the case of double credits, the intent of Congress expressed in other sections of the Code has some probative value in similar situations. "[I]t is more cogent to conclude that Congress was cognizant of the problem and was not necessarily able to cover every possibility." 589 F.2d at 1389.

While we have decided that petitioners' claim of a new jobs credit and an investment credit for the same expenditure constitutes an impermissible double credit, we still must determine the proper method of computing the two credits in this situation. Respondent argues that the basis used in computing the investment credit on the fence should be reduced by the amount of new jobs credit taken with respect to wages paid for construction of the fence.[15] In support of this position, respondent cites by analogy section 1.280C–1, Income Tax Regs., which requires a similar reduction in the amount subject to depreciation. At no point in the litigation of this case

---

[14]For example, for each dollar paid to a new employee, an employer who is taxed in the 70-percent marginal bracket would otherwise receive 70 cents in reduced tax from the wage deduction in addition to 50 cents of new jobs credit. The employer would thus receive $1.20 in return for the $1 expenditure. S. Rept. 95–66, *supra*, 1977–1 C.B. 469, 489.

[15]It is worthy to note that the double credit claimed in this case could be eliminated just as easily by reducing the amount of wages qualifying for the new jobs credit by the amount of investment credit taken with respect to the wage expense.

did petitioners offer an alternative method for computing the two credits other than allowing both credits in full.

In the stipulation of facts, petitioners and respondent agreed that our decision concerning the proper amount of new jobs credit would affect the computation of the investment credit on the new fence. In view of petitioners' failure to offer any alternative approach, we think it reasonable to construe this stipulation as a concession that respondent's method for calculating the two credits should be applied if both credits are not allowed in full. Therefore, we take it as agreed by the parties that the basis used in computing the investment credit is reduced by the amount of new jobs credit taken for the same expenditure.

Accordingly, the basis for determining the investment credit on petitioners' fence is not $3,050, but rather $3,050 minus the amount of new jobs credit allocable to construction of the fence.

To reflect our conclusions herein,

*Decision will be entered under Rule 155.*