WILLAMETTE INDUSTRIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Willamette Industries, Inc. v. Commissioner
Docket Nos. 13440-78, 16313-79, 21473-81
United States Tax Court
T.C. Memo 1991-389; 1991 Tax Ct. Memo LEXIS 454; 62 T.C.M. (CCH) 451; T.C.M. (RIA) 91389; August 12, 1991, Filed *454 Petitioner's motion for reconsideration will be denied. Charles P. Duffy and Philip N. Jones, for the petitioner. Alan Summers, Robert F. Geraghty, Wendy S. Pearson, and Randall E. Heath, for the respondent. DRENNEN, Judge. DRENNEN
SECOND SUPPLEMENTAL MEMORANDUM OPINION These cases were originally assigned to Special Trial Judge Hu S. Vandervort pursuant to section 7456(d) (redesignated section 7443A(b) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755), and Rules 180, 181, and 183. [1] On September 22, 1987, the Court filed its opinion in these cases, T.C. Memo 1987-479, and provided that decisions would be entered under Rule 155. The parties were unable to agree to the correct tax liability. The cases were subsequently assigned to Special Trial Judge Carleton D. Powell pursuant to section 7443A for hearing under Rule 155. On July 5, 1990, the Court filed its supplemental memorandum opinion, T.C. Memo 1990-339 and again provided that decisions would be entered under Rule 155. Petitioner subsequently filed a motion for reconsideration of the so-called logging road costs issue on *455 July 23, 1990. A hearing was held on November 7, 1990, on the logging road costs issue and another issue unresolved between the parties pertaining to the Rule 155 computations. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. SECOND SUPPLEMENTAL MEMORANDUM OPINION OF THE SPECIAL TRIAL JUDGE POWELL, Special Trial Judge: At issue in these cases, generally, is the fair market value of timber eligible for treatment under section 631(a) for taxable years 1974 to 1977. Specifically, here, we must decide, in computing the fair market value of the timber, whether: (1) The cost of constructing the logging roads is to be included in or excluded from such value; and (2) the adjustment for growth of the timber is to end on the cut date or on the valuation date. Petitioner, an *456 Oregon corporation engaged in logging and related activities, harvested the timber in Oregon, Louisiana, and Arkansas. For convenience, reference to Louisiana timber also includes timber harvested in both Louisiana and Arkansas. Section 631(a) [2] provides that a taxpayer may elect to treat the cutting of timber as though it were a hypothetical sale or exchange of that timber and, therefore, a taxable event. Before enactment of the predecessor of section 631(a) (section 117(k) of the 1939 Internal Revenue Code), the entire gain realized from timber cut by a taxpayer was taxed as ordinary income. Consequently, a taxpayer electing section 631(a) treatment converts what would otherwise be ordinary income into capital gain on the cutting of eligible timber. *457 The capital gain or loss under section 631(a) is an amount equal to the fair market value of the timber as of the first day of the taxable year in which the timber is cut, less the taxpayer's adjusted basis for depletion of the timber. The fair market value of the cut timber then becomes the new basis of the timber for all purposes in the hands of the taxpayer. The resulting gain or loss qualifies for section 1231 capital gain or ordinary loss treatment, provided the required holding period is met. 1. Logging Road Costs Adjustment
Under the terms of U.S. Forest Service (USFS) contracts, the successful bidder is required to build certain logging roads on USFS lands to USFS specifications. The bidder acquires no ownership interest in the roads, which become the property of the USFS. In return, the purchaser is given a credit against the purchase price of the timber (purchaser road credit). The amount of the purchaser road credit is equal to the USFS's estimate of the expected road costs and is known to the bidders at the time their bids are placed. The actual road costs incurred by the purchaser may be higher or lower than the purchaser road credits. During the years *458 in suit, the purchaser road credits generally were 10 to 20 percent less than the actual costs incurred by petitioner to construct the roads. Petitioner amortized the cost of constructing the roads, pursuant to Revenue Ruling 71-354, 1971-2 C.B. 246, in an amount allocable to the percentage of the timber removed each year. The amortization deduction for the road construction costs is not at issue in this case. In our original opinion, T.C. Memo 1987-479, we held that the value of standing timber does not include the cost of constructing roads. We directed the parties to use the Cascade Appraisal Services (CAS) data base of comparable sales (i.e., the average indicated values) [3] as the starting point in the Rule 155 computation. A dispute between the parties arose regarding each party's interpretation of the Court's ruling that the value of standing timber does not include the cost of constructing roads. Respondent argued that the road construction costs must be subtracted from CAS' average indicated values while petitioner argued that the road construction costs should not be subtracted. In the Supplemental Memorandum Opinion, 1990 Tax Ct. Memo LEXIS 546, T.C. Memo 1990-339, 60 T.C.M. (CCH) 48, 52, T.C.M. (RIA) 90339 at 1616, *459 we held that the indicated market value of each subject timber sale should be reduced by the road construction costs reflected in the logging cost data portion of CAS's data analysis sheets. Petitioner subsequently filed its motion for reconsideration requesting the Court to reconsider our ruling on the issue of logging road costs to take into account the fact that on January 1 of each year all of the necessary roads were in place on the subject timber but none of the roads were then in place on the comparable timber sales. *460 Petitioner argues that, in its present form, the Supplemental Memorandum Opinion effectively ignores section 1.611-3(f)(1), [4] Income Tax Regs. According to petitioner, section 1.611-3(f)(1)(iii), Income Tax Regs., mandates that the presence or absence of roads be considered in determining value. *461 Petitioner further contends that CAS added the logging road construction costs to the logging costs of the comparable USFS timber because the comparable timber was offered for sale without roads in place. The purchaser of the timber, therefore, would be required to construct the roads on the comparable timber sales. All of the logging roads were in place before the valuation date, however, for the subject timber. Thus, petitioner argues, no increase in logging costs for the subject timber was necessary since a hypothetical purchaser would not have to incur road construction costs had he purchased the subject timber on the valuation date. Consequently, petitioner contends, the different treatment accorded the subject timber and the comparable timber by CAS is not inconsistent since it is based on the facts known to exist as of the valuation date. Respondent agrees that a tract of timber is worth more with the roads in place. Respondent argues, however, that two separate assets are involved: the standing timber and the roads. He contends that the road costs are separately depreciated or amortized and, therefore, should not be included in determining the value of the standing *462 timber. Respondent maintains that the adjustment for road construction costs should be the difference between the estimated cost of constructing the roads for the subject timber and the estimated cost of constructing the roads for the comparable timber. Respondent argues that if it were otherwise petitioner would get an ordinary income deduction for amortizing the roads and then an additional deduction for including those costs in the capital gains. Thus, the gist of respondent's position is that petitioner's method of adjusting for road construction costs is the practical equivalent of a double deduction. Petitioner contends that there is no double deduction. According to petitioner, depreciation or amortization of an asset does not affect the fair market value of the asset. Petitioner argues that the issue here is the timber's fair market value, not its basis. The determination of fair market value must take into account the accessibility of the timber, petitioner contends; therefore, the estimated cost of constructing the logging roads must be included in determining the timber's fair market value. Petitioner relies for its position on the regulations under sections 611 *463 (see supra note 4) and 631; [5]Revenue Ruling 71-354, supra; Private Letter Ruling 8549006 (September 3, 1985); [6] and the legislative history of the relevant statutes. According to petitioner, in determining the fair market value of the cut timber as of January 1 of the particular year, the regulations and revenue ruling require that accessibility of the timber must be evaluated as of that day. Petitioner claims that Priv. Ltr. Rul. 8549006 states respondent's position that USFS comparable sale data should be adjusted to reflect the absence of roads for purposes of sec. 631(a). *464 According to petitioner, furthermore, the legislative history pertaining to section 272(a) of Pub. L. 591 (the Internal Revenue Code of 1954), 68A Stat., shows that Congress did not intend that road costs would reduce the gain. Respondent disagrees, arguing instead that the letter ruling, the revenue ruling, and the legislative history indicate that the cost of the roads is not included in determining what is paid for the timber. Respondent contends that the revenue ruling and the regulations under section 611 are consistent with the Court's holding that roads are a separate asset and that the cost of the roads should not be added to the fair market value of the timber for purposes of section 631(a); i.e., under section 631(a) the value of the timber should not include the enhanced value attributable to the construction of roads. A fundamental tax principle is that a taxpayer cannot receive a double deduction or claim a double credit for the same item. See United States v. Skelly Oil Co., 394 U.S. 678, 684, 22 L. Ed. 2d 642, 89 S. Ct. 1379 (1969); Charles Ilfeld Co. v. Hernandez, 292 U.S. 62, 68, 78 L. Ed. 1127, 54 S. Ct. 596 (1934); United States v. Ludey, 274 U.S. 295, 71 L. Ed. 1054, 47 S. Ct. 608 (1927); United Telecommunications, Inc. v. Commissioner, 589 F.2d 1383 (10th Cir. 1978), *465 affg. 65 T.C. 278 (1975), supplemented by 67 T.C. 760 (1977); O'Brien v. Commissioner, 771 F.2d 476 (10th Cir. 1985), affg. on this issue and remanding on other issues 79 T.C. 776 (1982); Rome I, Ltd. v. Commissioner, 96 T.C. 697 (1991); The Cleveland Electric Illuminating Co. v. United States, 6 Cl. Ct. 711 (1984). As the Supreme Court has stated, "the Code should not be interpreted to allow 'the practical equivalent of double deduction,' absent a clear declaration of intent by Congress." United States v. Skelly Oil Co., 394 U.S. at 684. (Citations omitted.) Thus, whenever interpretation of a provision of the Internal Revenue Code or the Regulations thereunder is involved, unless the statute clearly requires otherwise, courts must interpret the provision in a manner which will not result in a double deduction or credit since "In the absence of a provision * * * definitely requiring it, a purpose so opposed to precedent and equality of treatment * * * will not be attributed to lawmakers." Charles Ilfeld Co. v. Hernandez, 292 U.S. at 68. *466 The legislative history upon which petitioner relies pertains to text in the new section 272 [7] and amendments to section 117(k) of the 1939 Code under which certain administrative and other expenses, [8] incurred in the taxable year in which the timber is cut, in connection with the holding and quantity measurement of timber, were to be disallowed as expenses and added to the adjusted depletion basis of the timber cut, thereby reducing capital gain. H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591) (the Internal Revenue Code of 1954), 83d Cong., 2d Sess. 60 (1954). These provisions were never enacted. H. Rept. No. 2543 (Statement of Managers) to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 33, 53 (1954). *467 Petitioner, citing H. Rept. No. 1337, supra at 60, recognizes that the unenacted provisions did not pertain to road construction costs or other expenses relating to the actual harvesting of the timber, which would continue to be deductible as business expenses. Nevertheless, petitioner would have the Court extrapolate from Congress' refusal to enact those provisions a congressional intent not to add logging road costs to basis, and, thus, not to reduce the amount of capital gain either under the proposed legislation or otherwise. Petitioner's legislative history analysis states too much. Our review of the legislative history pertaining to section 117(k) of the 1939 Code, as well as sections 272 and 631 of the 1954 Code, convinces us that Congress never focused on the fact pattern presented in the instant case. Section 117(k) of the 1939 Code was added by section 127 of the Revenue Act of 1943, ch. 63, tit. I, 58 Stat. 46. The summary explanation for Congress' action is set forth as follows (S. Rept. No. 627, 78th Cong., 1st Sess., to accompany H.R. 3687 (1943), 1944 C.B. 973, 993): TIMBER RELIEF. Your committee is of the opinion that various timber owners *468 are seriously handicapped under the Federal income and excess profits tax laws. The law discriminates against taxpayers who dispose of timber by cutting it as compared with those who sell timber outright. The income realized from the cutting of timber is now taxed as ordinary income at full income and excess profits tax rates and not at capital gain rates. In short, if the taxpayer cuts his own timber he loses the benefit of the capital gain rate which applies when he sells the same timber outright to another. Similarly, owners who sell their timber on a so-called cutting contract under which the owner retains an economic interest in the property are held to have leased their property and are therefore not accorded under present law capital-gains treatment of any increase in value realized over the depletion basis. In order to remedy this situation, it is proposed to amend the existing law as follows: If the taxpayer so elects upon his return, the cutting of timber during the year by the taxpayer who owns or has a contract right to cut such timber is treated as a sale or exchange of the timber cut during the year and such cut timber is considered property used in a trade or *469 business of the taxpayer for the purpose of section 117(j) of the Internal Revenue Code provided the taxpayer has owned such timber or held such contract right for a period of more than six months prior to the beginning of such year. Where such an election is made, gain or loss to the taxpayer is recognized in an amount equal to the difference between the adjusted basis for depletion of such timber in the hands of the taxpayer and the fair market value of such timber. The fair market value is determined as of the first day of the taxable year in which the timber is cut.
The understanding of certain Senators serving on the Finance Committee as to the purpose of section 117(k) is set forth in the following colloquy during the Senate discussions on the Presidential veto of the 1943 tax bill (the veto subsequently was overridden), 90 Cong. Rec. 1950, 1965 (1944): Mr. BARKLEY [Majority Leader]. If I may, I should like to ask the Senator another question. The bill which the President has just vetoed provides that the owner of the timber who himself cuts it and markets it is allowed the same tax privilege that someone else would be allowed if he bought the timber and himself sawed *470 it and marketed it? Mr. GEORGE [Chairman, Finance Committee]. Yes; that is essentially true, because any purchaser of the timber who immediately cuts it, of course, recovers the full amount he paid for the timber before he begins to have a net taxable income. Mr. BARKLEY. And a company which is in the lumber business, buying timber year by year, and sawing it year by year, of course, accounts for any profit as an annual income. It seems to me that is an entirely different proposition from that of a man who has over a period of a half a century developed a forest or a tract of timber, and then either decides to sell it as an entirety, or to cut it and market it himself. If he sells it he gets a capital gain, but if he cuts it and markets it piece by piece or by the thousand feet, under the present law he is taxed on income and not as a capital gain. Mr. GEORGE. The Senator correctly states the case. * * * Mr. TAFT. Would the Senator from Georgia comment on the statement "This would encourage reforestation"? Is it not true that the more profitable the lumber industry is the more reforestation would be encouraged? Is not the amendment designed to encourage reforestation? *471 Mr. GEORGE. Unquestionably it is so designed. * * * This is what it would permit: If one owns a thousand acres of timbered land, with hardwood and softwood, and timber of all sizes and ages scattered throughout the thousand acres, he may take his mill onto the land, and he may by selective cutting continue his timber operations or lumbering operations with respect to that land through a long period of time; * * * He is not only induced to reforest, to replant as he cuts the timber, but he is enabled to do it because he is not required to take it all off at once. All the amendment would do would be to give to the owner the right to treat his income from his timber -- not from his operations, not from his profits on this lumber sold -- but from his timber, as a capital gain. * * * Mr. BARKLEY. * * * The President refers to the lumber industry as being permitted to treat income from the cutting of timber as a capital gain rather than as annual income, and cites that provision of the bill as a loophole in favor of special privilege. * * * The person who buys, cuts, and markets the timber pays taxes on an annual income basis, because he is in that business; and in order to arrive *472 at his income for that year upon his operation in that or any other field, he is allowed to deduct the costs originally, together with the expenses of operation, to arrive at the net income upon which he will pay a tax. But if the owner of that same land and that same timber, instead of selling it to another, moves a sawmill upon it and cuts it himself and sells it himself in the market, he is taxed upon it as income for that year. In other words, if he sells it outright to another, he is taxed in one way. If he cuts it himself, he is taxed in another way. * * * I did not vote for [the timber amendment] in order to create a fantastic or imaginary loophole to allow someone to escape taxes. I voted for it as an act of justice to those who grow timber over a period of a generation, or half a century, and who are entitled to just treatment, no matter in what manner they dispose of the timber.
Thus, section 117(k) of the 1939 Code was enacted to put owners of timber and timber cutting contracts who elected to cut their own timber and market it on a parity with someone who merely purchased the timber, sawed, and marketed it. There is no indication, however, that Congress intended *473 to give the owners of timber and timber cutting contracts more of a benefit than what was provided to someone who purchased the timber. In 1951, Congress extended the benefits of section 117(k) to certain recipients of coal royalties. Sec. 325(b) of the Revenue Act of 1951, ch. 521, tit. III, 65 Stat. 501. Section 631(a) of H.R. 8300 continued the treatment pertaining to the cutting of timber provided by section 117(k) of the 1939 Code (except as to three aspects unrelated to the issue here). Joint Comm. on Internal Revenue Taxation, 83d Cong., 2d Sess., Summary of the New Provisions of the Internal Revenue Code of 1954 (H.R. 8300) 90-91 (1955). As we discussed earlier, certain provisions in the proposed section 272 of H.R. 8300, as passed by the House, would have required certain administrative and other expenses incurred in connection with the holding and quantity measurement of timber to be added to the adjusted depletion basis of the timber cut for the purpose of determining the gain or loss to be realized on account of the cutting of the timber. See supra notes 7 and 8; S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 337 (1954). The *474 Ways and Means Committee Report explains the rationale for the pertinent proposed provisions as follows, H. Rept. No. 1337, supra, at 59-60: There has been uncertainty as to the tax treatment of expenses incurred in connection with the capital gains arising from such timber or coal royalties. In some cases the taxpayer may have no income except capital gains, and the right to deduct business expenses from ordinary income is of no avail to him. Your committee has adopted a provision identifying the expenses in connection with the sales [of timber], * * * which are proper offsets against capital gain and which are properly applicable against ordinary income. * * * In the year of cutting timber, the expenses incurred in connection with the holding and quantity measurement of the timber are to be added to the adjusted basis and will reduce the amount of the capital gain. Only that portion of these expenses which is allocable to the timber actually cut may be added to the adjusted basis. However, expenses incurred in actually cutting timber will continue to be deductible as business expenses. Expenditures of a timber or coal owner attributable to making and administering *475 the contract under which the disposition of the coal or timber occurs and expenditures necessary to preserve the economic interest retained under the contract, will also be added to the adjusted basis of the coal or timber in computing capital gain or loss. The expenses which serve to reduce the amount of these capital gains are not to be deductible in computing ordinary taxable income.
In the detailed analysis of section 272, the report further indicates, H. Rept. No. 1337, supra at A68: It is intended that only that portion of such expenditures [administrative and other expenses incurred in connection with the holding and quantity measurement of the timber cut] allocable to the timber cut will be disallowed as a deduction. The remainder of such expenditures shall be treated as if section 631(a) were not applicable, and as under present law, may be deducted from other income as a business deduction, or depending upon the application of section 266 to the expenditure, may be capitalized at the election of the taxpayer.
The detailed analysis of section 631(a) further makes clear that the expenses disallowed by proposed section 272 do not include those expenses *476 directly related to the actual cutting of the timber which "continue to be deductible as business expenses, without regard to the basis or value of the timber cut." H. Rept. No. 1337, supra at A190. The House report and certain testimony before the Senate Finance Committee indicate that the provisions added by the proposed section 272 were meant to help certain individuals who did not have ordinary income against which to charge the subject expenses. [9] Hearings on H.R. 8300 (Pub. L. No. 591) Before the Committee on Finance, 83d. Cong., 2d Sess. 186, 2201, 2226 (1954) (hereinafter sometimes referred to as the Finance Committee Hearings). *477 The Senate Finance and Conference Committee reports are silent as to the reasons these provisions were eliminated from sections 272 and 631 as enacted. See S. Rept. No. 1622, supra at 337-339; H. Rept. No. 2543, supra at 53-54. The Finance Committee Hearings suggest numerous reasons why these provisions were eliminated, none of which indicates an intent to provide a double tax benefit. See e.g., Finance Committee Hearings, supra at 183-186, 989-990, 1315-1316, 2227. Thus, nothing in the legislative history of section 117(k) of the 1939 Code or section 631 of the 1954 Code indicates that Congress clearly intended to provide the practical equivalent of a double deduction. When the statute is silent, the presumption is against a double tax benefit. See Rome I, Ltd. v. Commissioner, 96 T.C. at 706; O'Brien v. Commissioner, 79 T.C. 776 at 788. As for the regulations and rulings cited by petitioner, our mandate is to interpret them in a manner to preclude the allowance of a double benefit unless Congress clearly declares an intent to provide one. Charles Ilfeld Co. v. Hernandez, 292 U.S. at 68. In reviewing the *478 cited regulations and the rulings, we could find nothing in them which requires that the costs of constructing the roads be included in the fair market value of the standing timber in these circumstances. Hence, our decision that the value of the standing timber does not include the road construction costs in these circumstances is not contrary to the regulations and prevents a double tax benefit. Petitioner contends that there is no double deduction here but cites no cases in support of its position. We also could find no case directly on point with this issue. [10] We have, however, adjusted the basis of qualified investment property for purposes of the investment tax credit in order to avoid a double credit. See, e.g., O'Brien v. Commissioner, supra at 776; Zuanich v. Commissioner, 77 T.C. 428 (1981); United Telecommunications, Inc. v. Commissioner, supra at 278. The same rationale applies here. *479 Under section 631(a), the fair market value of the cut timber becomes the new basis of the timber for all purposes for which the cost is a necessary factor. By increasing the fair market value of the standing timber by the road construction costs, petitioner reduces the amount of ordinary income upon which the tax is computed when the timber is marketed. In addition, petitioner deducts separately through amortization the cost of constructing the roads, further reducing its ordinary income. This is the practical equivalent of a double deduction which is not permitted absent a clear declaration on the part of Congress to allow it. We could find no such clear declaration. Moreover, we find no specific provision in sections 1.611-3(f)(1) or 1.631-1(d)(2), Income Tax Regs., or elsewhere in the regulations or in the Code, which would require or permit the treatment of the road construction costs propounded by petitioner. See Wyman-Gordon Co. v. Commissioner, 89 T.C. 207 (1987). Consequently, we hold that, in determining the fair market value of the standing timber, the road construction costs must be eliminated. [11]
*480 2. Growth Adjustment
The USFS timber in Louisiana generally grows at a rate of 7 percent per year. USFS contracts in Louisiana are cut out on a compartment or unit basis. The bid price for a unit or compartment on a USFS tract is based on the volume determined from the cruise date (approximately 6 to 9 months before the bid date); therefore, the growth inures to the benefit of the purchaser. In our original opinion we stated that, for section 631(a) purposes, comparable sales of USFS timber should be adjusted for the growth which took place between the cruise date and the valuation date. Subsequently, in a hearing held on September 7, 1988, we expressed our belief that the growth adjustment should account for the growth between the cruise date and the cut date. At this hearing, however, petitioner argued that if the comparable timber is adjusted for growth to the cut date, the subject timber also should be adjusted for growth to that date. We decided to take the issue under advisement pending additional briefing. In the Supplemental Memorandum Opinion we held that a 7-1/2-month adjustment period for growth between the cruise date and the actual sales date was a fair *481 time period. T.C. Memo 1990-339, 1990 Tax Ct. Memo LEXIS 546, 60 T.C.M. (CCH) 48, 52, T.C.M. (RIA) P90339 at 1616. Subsequently, at the hearing held on November 7, 1990, the parties advised the Court that they could not agree on a mutual interpretation of our holding as to the end of the growth adjustment period. Respondent, by combining our discussion of the Southern Pine Growth Factor and Southern Cut-out Schedule, interprets the supplemental opinion to require the growth adjustment period to end on the cut date of the timber. Petitioner, on the other hand, interprets the opinion to require the growth adjustment period to end on the valuation date. Petitioner, citing portions of the findings of fact in our original Memorandum Opinion, argues that the sole purpose of the growth adjustment is to adjust the volume of timber for the comparable USFS sales to take into account the delay that occurs between the date the USFS timber is cruised and the date it is sold at public auction. Petitioner further argues that section 1.631-1(d)(2), Income Tax Regs., see supra note 5, requires the valuation to be made based on the condition of the timber on the valuation date, *482 not on the cruise date, or the bid date, or the harvest date, or any other date. According to petitioner, ending the growth adjustment period on the valuation date is consistent with section 1.631-1(d)(2), Income Tax Regs., and the original intent of the growth adjustment. Petitioner contends, in the alternative, that if the comparable timber is adjusted for growth to the cut date then the subject timber also should be adjusted for growth to the cut date. Respondent argues on the other hand that, when the bids on the comparable timber are formulated, the bidders take into consideration the estimated volume of timber on the cut date, not on the bid date. Therefore, the adjustment must be made to the date the timber is cut to take into account what the bidders are bidding for. Respondent argues that the subject timber should not be adjusted similarly to the cut date since the subject timber's volume already represents that volume. Respondent cites no authority for his position. In our research on this issue we also found no cases which address this issue. We believe, however, that petitioner has the better argument. The theory behind the various adjustments to the comparable *483 sales is to put the comparable timber and the subject timber on the same basis. See Buse v. Commissioner, 71 T.C. 1129, 1136 (1979). Under the scheme of section 631(a), the timber cut during a taxable period is treated as if it were sold or exchanged on the first day of that period and the valuation is made as of that date. We can find no compelling justification under the statutory scheme for allowing a growth adjustment beyond that valuation date. Consequently, we hold that the period for the adjustment for the Southern pine growth is to run from the cruise date to the valuation date. To reflect the foregoing, Petitioner's motion for reconsideration will be denied. Footnotes
1. All section references are to the Internal Revenue Code, as in effect for the years in issue, unless otherwise noted. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Sec. 631(a), as in effect for the years in issue, provides as follows: SEC. 631. GAIN OR LOSS IN THE CASE OF TIMBER, COAL, OR DOMESTIC IRON ORE.
(a) Election to Consider Cutting as Sale or Exchange. -- If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 6 months [more than 9 months for 1977] before the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. * * *↩
3. In deriving its average indicated values for USFS comparable sales, CAS started with the so-called high bid, which includes the estimated road construction costs. It then subtracted from the high bid the purchaser road credits for merchantable and per acre material to arrive at the so-called statistical high bid (stat high bid). CAS then made a quality adjustment. Next CAS made a logging cost adjustment. The first step CAS took in making the logging cost adjustment was to determine the logging costs of the USFS comparable sale. The total logging costs of the USFS comparable were then compared to the total logging costs for a specific subject area. Where the total logging costs of the USFS comparable timber exceeded the total logging costs for the subject timber, CAS increased the indicated market value of the subject timber by the difference. Thus, for the years in suit CAS added in the cost of constructing roads to derive the total logging cost of the USFS comparable timber but did not include the cost of constructing roads to derive the total logging cost of the subject timber.↩
4. Sec. 1.611-3(f)(1), Income Tax Regs., provides as follows: 1.611-3. Rules applicable to timber. * * * (f) Determination of fair market value of timber property. (1) If the fair market value of the property at a specified date is the basis for depletion deductions, such value shall be determined, subject to approval or revision by the district director upon audit, by the owner of the property in the light of the most reliable and accurate information available with reference to the condition of the property as it existed at that date, regardless of all subsequent changes, such as changes in surrounding circumstances, and methods of exploitation, in degree of utilization, etc. Such factors as the following will be given due consideration: (i) Character and quality of the timber as determined by species, age, size, condition, etc.; (ii) The quantity of timber per acre, the total quantity under consideration, and the location of the timber in question with reference to other timber; (iii) Accessibility of the timber (location with reference to distance from a common carrier, the topography and other features of the ground upon which the timber stands and over which it must be transported in process of exploitation, the probable cost of exploitation and the climate and the state of industrial development of the locality; and (iv) The freight rates by common carrier to important markets.↩
5. Sec. 1.631-1(d), Income Tax Regs., provides in pertinent part as follows: Sec. 1.631-1 Election to consider cutting as sale or exchange. * * * (d) Computation of gain or loss under the election. * * * (2) The fair market value of the timber as of the first day of the taxable year in which such timber is cut shall be determined, subject to approval or revision by the district director upon examination of the taxpayer's return, by the taxpayer in the light of the most reliable and accurate information available with reference to the condition of the property as it existed at that date, regardless of all subsequent changes, such as changes in surrounding circumstances, methods of exploitation, degree of utilization, etc. The value sought will be the selling price, assuming a transfer between a willing seller and a willing buyer as of that particular day. Due consideration will be given to the factors and the principles involved in the determination of the fair market value of timber as described in the regulations under section 611. (3) The fair market value as of the beginning of the taxable year of the standing timber cut during the year shall be considered to be the cost of such timber, in lieu of the actual cost or other basis of such timber, for all purposes for which such cost is a necessary factor. * * * ↩
6. Respondent's rulings do not have the effect of law but merely represent the Commissioner's position with respect to a specific factual situation. Rome I, Ltd. v. Commissioner, 96 T.C. 697, 702 (1991); Tandy Corp. v. Commissioner, 92 T.C. 1165, 1170 (1989). Private letter rulings are not precedent but have been consulted solely for purposes of considering respondent's administrative practices. Sec. 6110(j)(3); Rowan Cos. v. United States, 452 U.S. 247, 261 n. 17, 68 L. Ed. 2d 814, 101 S. Ct. 2288 (1981); First Chicago Corp. v. Commissioner, 96 T.C. 421, 443 (1991). According to petitioner, Priv. Ltr. Rul. 8549006 shows that respondent is taking an inconsistent position here. The applicable text of Priv. Ltr. Rul. 8549006 (September 3, 1985) cited by petitioner is as follows: The prices bid for the right to cut U.S. Forest Service timber include an amount specified as necessary to construct the required access roads on National Forest lands to use in harvesting the timber. The purchaser is subsequently granted "purchaser credit" for such road costs. In essence, the total amount of the bid reflects the value of the timber as if the roads necessary for removal were already in place. In order to properly use U.S. Forest Service timber disposal data, as well as data on any timber disposition, as indicators of value, adjustments must be made in the data to reflect differences between such timber and the timber under appraisement that have a material effect on value. Accessibility is one of the factors to be taken into account in valuing timber. Section 1.611-3(f)(1)↩ of the regulations. To the extent there is a significant difference between the accessibility of the timber being valued and of the timber in a U.S. Forest Service disposal, the U.S. Forest data should be adjusted accordingly.
7. Sec. 272 of H.R. 8300 (the Internal Revenue Code of 1954) as originally passed by the House provided as follows: SEC. 272. CUTTING OF TIMBER AND DISPOSAL OF COAL OR TIMBER. (a) Where the cutting of timber by a taxpayer is considered a sale or exchange under section 631(a), no deduction shall be allowed for administrative and other expenses, incurred in the taxable year such timber is cut, in connection with the holding and quantity measurement of such timber. (b) Where the disposal of coal or timber by the taxpayer is covered by section 631(b), no deduction shall be allowed for expenditures attributable to the making and administering of the contract under which such disposition occurs and to the preservation of the economic interest retained under such contract. This subsection shall not apply to any taxable year during which there is no production, or income, under the contract. ↩
8. These expenses included "ad valorem taxes imposed by State or local authorities, costs of fire protection (including patrolling, signposting, building of firebreaks, costs of communication facilities necessary to such fire patrolling, equipment necessary for fire prevention or control, development of water facilities for fire fighting), insurance costs of all kinds relating to the property (not including liability insurance), costs incurred in administering a timber lease (including costs of bookkeeping and technical supervision), costs of timber measurement (including surveying), and interest on loans attributable to the timber." H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. A67-68 (1954).↩
9. The following analysis best describes the purported genesis for the section 272 provisions: ANALYSIS OF PROVISIONS OF H.R. 8300 APPLICABLE TO TIMBER OWNERS 1. Description of provisions of H.R. 8300
H.R. 8300 contains provisions designed to afford tax relief to owners of coal (secs. 272 and 631). These sections, which amend section 117(k) of the present code, relate to timber as well as coal. Although adopted to benefit coal owners, they seriously (and, we believe, inadvertently) penalize timber owners. Under the present code, persons receiving capital gains are entitled to determine their tax under the so-called alternative computation. Under this computation, the taxpayer may deduct ordinary expenses only from ordinary income. Apparently most coal lessors have no ordinary income, and the amendments to section 117(k) of the present code were requested to permit these taxpayers to deduct their expenses from capital gains. Timber owners have ordinary income against which to deduct their ordinary expenses. Consequently, they have never asked for, and do not want, the special-tax [sic] treatment desired by the coal lessors. Furthermore, the new provisions discriminate against timber owners in that no other taxpayers are required to deduct ordinary expenses from capital gains. [Hearings on H.R. 8300 (Pub. L. No. 591) Before the Committee on Finance, 83d Cong., 2d Sess. 2226 (1954).]↩
10. The result in Estate of Joslyn v. Commissioner, 500 F.2d 382 (9th Cir. 1974), revg. and remanding 57 T.C. 722 (1972), is not controlling here since in Joslyn↩ the brokerage expenses did not involve a separately depreciable asset while the road construction costs involved here do.
11. Cf. sec. 1.1016-6(a), Income Tax Regs., which provides: Sec. 1.1016-6. Other applicable rules. (a) Adjustments must always be made to eliminate double deductions or their equivalent. Thus, in the case of the stock of a subsidiary company, the basis thereof must be properly adjusted for the amount of the subsidiary company's losses for the years in which consolidated returns were made.↩